IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,818

SALLIE A. SCRIBNER and MARK E. MCNEMEE,
*Appellants*,

v.

BOARD OF EDUCATION OF U.S.D. NO. 492,
FLINTHILLS, BUTLER COUNTY, KANSAS,
*Appellee*,

and

THE STATE OF KANSAS,
*Intervenor.*

SYLLABUS BY THE COURT

1.

The 2014 Kansas Legislature did not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution or Sections 1 and 2 of the Kansas Constitution Bill of Rights when it enacted L. 2014, ch. 93, §§ 49, 50, 52, 53.

2.

Under the facts of this case, L. 2014, ch. 93, §§ 49, 50, 52, 53 did not cause a breach of contract.

Appeal from Butler District Court; CHARLES M. HART, judge. Opinion filed June 15, 2018. Affirmed.

*David M. Schauner*, of Kansas National Education Association, argued the cause and was on the briefs for appellant.

1

*Edward L. Keeley,* of McDonald Tinker PA, of Wichita, argued the cause, and *Katy E. Tompkins*, of the same firm, was with him on the brief for appellee.

*Dwight R. Carswell*, assistant solicitor general, argued the cause, and *Jeffrey A. Chanay,* chief deputy attorney general, *Stephen R. McAllister*, solicitor general, *Dennis D. Depew,* deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the brief for intervenor.

The opinion of the court was delivered by

LUCKERT, J.:  For a period before July 1, 2014, the contracts of tenured elementary and secondary teachers in Kansas school districts automatically continued into the next school year unless a school district gave a timely, written notice of termination or nonrenewal that set out the reasons for the termination or nonrenewal and notified the teacher of his or her rights to a due process hearing. See K.S.A. 2013 Supp. 72-5436 to 72-5438, K.S.A. 72-5439, 72-5441 to 72-5444 (Furse 2002), K.S.A. 2013 Supp. 72-5445, K.S.A. 72-5446 (Furse 2002). But the 2014 Kansas Legislature removed both (1) the requirement that the Board state its reasons for the termination or nonrenewal and (2) the right to a due process hearing. L. 2014, ch. 93.

Here, two teachers seek a judgment declaring the 2014 amendments to K.S.A. 72-5436 et seq. (the Teacher Due Process Act) unconstitutional because the legislation constituted a taking of their property without due process in violation of the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Constitution Bill of Rights. We reject the teachers' arguments.

2

FACTS AND PROCEDURAL HISTORY

Plaintiffs Sallie A. Scribner and Mark E. McNemee filed a joint petition for declaratory judgment and breach of contract in Butler County District Court. According to their petition, both had been teachers employed by the Defendant Board of Education of Unified School District No. 492, Butler County, Kansas (Board). In May 2015, almost one year after the 2014 amendments became effective, the Board sent Scribner and McNemee notices advising them the Board would not be renewing their teaching contracts. The Board did not state its reasons for the decision or give notice of any due process rights. These omissions, according to Scribner and McNemee, violated their statutory rights as they existed before July 1, 2014, rights they contend were taken from them without due process.

The Board answered the petition, contending it had complied with the law in effect on May 2015 and the 2014 amendments were constitutional. The State moved to intervene on Count I in order to defend the constitutionality of the 2014 amendments. The district court granted the motion.

Both the teachers and the Board moved for summary judgment based on the following stipulated facts (paragraphs 1-32):

"Parties

"1. The Defendant Board of Education of Unified School District No. 492, Flinthills, Butler County, KS (Board or School District), is duly organized pursuant to Article 6, Section 5 of the Kansas Constitution and Chapter 72 of the Kansas Statutes Annotated.

3

"2.     Plaintiff Sallie A. Scribner was first employed as a teacher by the defendant U.S.D. No. 492 beginning with the 1997-1998 school year.

"3.     Ms. Scribner had been continuously employed as a teacher by the School District for 18 consecutive years, from the beginning of the 1997-1998 school year through the end of the 2014-2015 school year.

"4.     Plaintiff Mark E. McNemee was first employed as a teacher by U.S.D. No. 492 beginning with the 1999-2000 school year.

"5.     Mr. McNemee had been continuously employed as a teacher by the School District for 16 consecutive years, from the beginning of the 1999-2000 school year through the end of the 2014-2015 school year.

"6.     May 15, 2015, was the third Friday in May 2015. [Court's note:  This date is the statutory deadline for providing written notice of termination or nonrenewal. See K.S.A. 2013 Supp. 72-5437(a). Absent such notice, teacher contracts continue for the following school year.]

"7.     At the May 12, 2015, meeting of the Board of Education of U.S.D. No. 492, the Board adopted resolutions directing that Plaintiffs be given notice of the Board's intent to not renew their employment contracts for the 2015-2016 school year.

"8.     The Board served Plaintiffs with written notices of its intent to not renew their contracts for the 2015-2016 school year in notice letters from Stephanie Girty, the Clerk of the Board, on May 12, 2015.

"H.B. 2506

"9.     House Bill 2506 (H.B. 2506) was introduced into the state House of Representatives on January 27, 2014. (2014 House Journal, p. 1621.)

4

"10.     H.B. 2506 was an act to repeal K.S.A. 72-60b03 relating to the expiration provision of the Midwestern Higher Education Compact Act. (2014 House Journal, p. 1621.)

"11.     On January 28, 2014, H.B. 2506 was referred to the House Education Budget Committee. (2014 House Journal, p. 1626.)

"12.     A hearing on H.B. 2506 was held in the House Education Budget Committee on February 19, 2014. (House Actions Report, p. 211.)

"13.     H.B. 2506 was passed without amendment by the House by a 122-1 vote on February 26, 2014. (2014 House Journal, p. 1791; House Actions Report, p. 211.)

"14.     That same day, February 26, 2014, H.B. 2506 was introduced into the Senate. (2014 Senate Journal, p. 1641; House Actions Report, p. 211.)

"15.     On February 27, 2014, H.B. 2506 was referred to the Senate Committee on Ways and Means. (2014 Senate Journal, p. 1661; House Actions Report, p. 211.)

"16.     At the April 1, 2014, meeting of the Senate Committee on Ways and Means, the committee voted to remove the contents of H.B. 2506 and replace it with the contents of S.B. 452, creating Senate Substitute for H.B. 2506. (Minutes of the Committee on Ways and Means, Tuesday, April 1, 2014, p. 5.)

"17.     The original version of Senate Substitute for H.B. 2506 which was passed by the Senate Ways and Means Committee on April 1, 2014, contained no provisions that amended the Teacher Due Process Act, K.S.A. 2013 Supp. 72-5436 et seq. (2014 Senate Journal, p. 1942.)

"18.     On Thursday, April 3, 2014, the Senate, having resolved itself into the Committee of the Whole, voted multiple times to amend S. Sub. for H.B. 2506. (2014 Senate Journal, pp. 1986-2006.)

5

"19.     The last of the amendments to S. Sub. for H.B. 2506 approved by the Senate on Thursday, April 3, 2014, was a proposal by Senator Arpke which made amendments to the Teacher Due Process Act, K.S.A. 2013 Supp. 72-5436 et seq. (2014 Senate Journal, pp. 1994-2006.)

"20.     No committee hearings were held in the Senate regarding Senator Arpke's amendments to Senate Sub. for H.B. 2506. (House Actions Report, pp. 211-212.)

"21.     Senator Arpke's amendments had not been considered by either house of the Kansas legislature before they were added to S. Sub. for H.B. 2506 on April 3, 2014.

"22.     After debate, Senate Substitute for H.B. 2506, as amended, was passed by the Senate on April 3, 2014, by a vote of 23 to 17. (2014 Senate Journal, p. 2005.)

"23.     On Friday, April 4, 2014, the House voted to nonconcur to S. Sub. for H.B. 2506, as amended, and requested that a conference committee be appointed. (2014 House Journal, p. 2185.)

"24.     A conference committee consisting of three members of each legislative body was appointed on Friday, April 4, 2014, to reconcile the version of H.B. 2506, which had been passed by the House and S. Sub. for H.B. 2506, as amended, which had been passed by the Senate. (2014 House Journal, pp. 2185; 2014 Senate Journal, p. 2010.)

"25.     On Saturday, April 5, 2014, the conference committee failed to reach agreement on S. Sub. for H.B. 2506, as amended. On Sunday, April 6, 2014, the conference committee report to agree to disagree was adopted by both legislative bodies and a second conference committee was appointed. (2014 House Journal, p. 2294; 2014 Senate Journal, p. 2243.)

"26.     Later on Sunday, April 6, 2014, the second conference committee reached agreement on S. Sub. for H.B. 2506, as amended, when the House acceded to all Senate amendments. The second conference committee issued its conference committee report.

6

"27.	After debate, the House voted to adopt the second conference committee report on S. Sub. for H.B. 2506 later on Apri1 6, 2014, by the vote of Yeas 63 to Nays 57. (2014 House Journal, pp. 2294, 2342.) That vote approved S. Sub. for H.B. 2506, as amended, including Senator Arpke's amendments.

"28.	After debate, the Senate also voted to adopt the second conference committee report on S. Sub. for H.B. 2506 on April 6, 2014, by the vote of Yeas 22 to Nays 16. (2014 Senate Journal, p. 2292.) That vote approved S. Sub. for H.B. 2506, as amended, including Senator Arpke' s amendments.

"29.	Governor Brownback signed S. Sub. for H.B. 2506, as amended, on April 21, 2014. (2014 House Journal, p. 2347.)

"30.	Senate Sub. for H.B. 2506, as amended, took effect and was in force from and after its publication in the Kansas Register. (2014 Kansas Session Laws, Ch. 93, § 68.)

"31.	Senate Sub. for H.B. 2506 was published in the Kansas Register on May 1, 2014. (33 Kansas Register, No. 18, May 1, 2014, pp. 438-455.)

"32.	K.S.A. 2013 Supp. 72-5436, 72-5437, 72-5438, 72-5439, 72-5445, and 72-5446 of the Teacher Due Process Act were amended by S. Sub. for H.B. 2506 effective July 1, 2014. (2014 Kansas Session Laws, Ch. 93, § 67.)"

The district court considered these stipulated facts and, after hearing oral argument, orally ruled in favor of the Board. The district court later filed a journal entry making findings of fact and conclusions of law. In these, the district court stated the 2014 amendments were "clear and unambiguous" in providing that the due process protections of the prior law no longer applied "to any K-12 teachers." This change did not deny due process, the district court ruled, because "when legislation affects a general class of people, the legislative process provides all the process that is due."

7

The district court noted Scribner's and McNemee's reliance on *Darling v. Kansas Water Office*, 245 Kan. 45, 774 P. 2d 941 (1989). But the district court distinguished *Darling* because "[t]he 'unique set of facts' and unusual situation" discussed in *Darling* are "not present here. Instead, the foundational general rule that the legislative process provides all the process that is due controls in this case." The court also noted that K.S.A. 72-5444 expressly prohibited it from declaring that Scribner and McNemee "had a 'vested right' which was not subject to amendments or nullification by the legislature."

As to Scribner's and McNemee's breach of contract claim, the district court concluded their theory of recovery would have required the Board to disregard the 2014 amendments and apply prior law, even though the prior law no longer existed. The district court held this theory lacked merit because "[t]he school board cannot have breached plaintiffs' employment contracts by following the law in place at the time."

Scribner and McNemee timely appealed and moved to transfer the case to this court. We granted the transfer motion. See K.S.A. 2017 Supp. 20-3017; Kansas Supreme Court Rule 8.02 (2018 Kan. S. Ct. R. 52).

ANALYSIS

The parties ask us to draw various conclusions based on Kansas law about the due process protections afforded to teachers. Thus, before delving into the specifics of the issues presented by Scribner and McNemee, we will briefly review the history of the various statutory protections and the caselaw interpreting those statutes.

The Kansas Legislature first provided teachers statutory protections in 1937 in the Tenure of Instructors Act, which applied to "[t]eachers and other professional employees,

8

employed in public school systems in cities having a population of 120,000 inhabitants or more." *Gillett v. U.S.D. No. 276*, 227 Kan. 71, 75, 605 P.2d 105 (1980). The Tenure of Instructors Act provided instructors continued employment "'during good behavior and efficient and competent service,'" and limited a board's authority to discharge or nonrenew a teacher except for the causes provided by statute and after notice and an opportunity for a hearing. *Million v. Board of Education*, 181 Kan. 230, 231-32, 310 P.2d 917 (1957) (quoting G.S. 1949, 72-5404).

The "evident purpose" of the legislation was "to protect competent and worthy instructors and other members of the teaching profession against unjust dismissal of any kind—political, religious or personal, and secure for them teaching conditions which will encourage their growth in the full practice of their profession, unharried by constant pressure and fear." *Million*, 181 Kan. at 234. But local boards of education retained the power to discharge teachers "for just cause in an orderly manner by the procedures specified." 181 Kan. at 234.

The Kansas Legislature repealed the Tenure of Instructors Act in 1974 and replaced it with K.S.A. 72-5436 et seq. See *Gillett*, 227 Kan. at 76. The 1974 legislation established "a comprehensive due process procedure covering the termination or nonrenewal of teacher[s'] contracts in every school district, area vocational-technical school, and community junior college in the state." 227 Kan. at 76. This court determined that the 1974 "statutory scheme," which provided "tenure for all school teachers throughout the state[,] has the same purpose as that of the Tenure of Instructors Act which is discussed in *Million.*" 227 Kan. at 76. This court later dubbed K.S.A. 72-5436 through 72-5446 as the "Teacher Due Process Act" or TDPA. The scope of the TDPA remained as stated in *Gillett* until the 2014 amendments were enacted.

9

Under the pre-2014 version of the TDPA, persons defined as "teachers" had a right of continuing contract: "All contracts of employment of teachers, as defined in K.S.A. 72-5436, . . . shall be deemed to continue for the next succeeding school year unless written notice of termination or nonrenewal is served as provided in this subsection." K.S.A. 2013 Supp. 72-5437(a). Certain procedural protections applied if a teacher had completed three consecutive years and received a fourth contract offer by the same school district or if the teacher had accumulated specified periods of service in more than one district. See K.S.A. 2013 Supp. 72-5445(a). Although this provision did not use the term "tenure," that term has been used colloquially to describe the years of service requirement. We use "tenure" in this decision as a short form for discussing the consecutive years of employment requirement.

Under the procedural requirements of the pre-2014 TDPA, to terminate or to not renew a contract for a tenured teacher, a school board had to provide notice by the third Friday in May of the reasons for the decision and inform the teacher of his or her right to a hearing. K.S.A. 2013 Supp. 72-5437(a); K.S.A. 2013 Supp. 72-5438(a). When requested, the school board had to comply with due process hearing procedures specified by the statute. See K.S.A. 2013 Supp. 72-5436 et seq.

The pre-2014 TDPA defined "teachers" to include "any professional employee who is required to hold a certificate to teach in any school district, and any teacher or instructor in any area vocational-technical school or community college." K.S.A. 2013 Supp. 72-5436(a). A "Board" was defined as, "the board of education of any school district, the board of control of any area vocational-technical school and the board of trustees of any community college." K.S.A. 2013 Supp. 72-5436(b).

By July 1, 2014, Scribner and McNemee had satisfied the years of service requirement that gave them procedural rights under the pre-2014 TDPA. Thus, until

10

July 1, 2014, they had a right of continuing contract. And if they had been terminated or not renewed by the third Friday in May—before the 2014 amendments became effective on July 1—they would have been entitled to the procedural protections of a notice that stated the reasons for the Board's decision and a due process hearing.

Under the 2014 amendments, a school district must still provide a notice of nonrenewal before the third Friday in May to prevent a teacher's contract from renewing. K.S.A. 2017 Supp. 72-2251(a). But if the district gives a timely notice of nonrenewal, the TDPA's statutory due process protections are no longer available to elementary and secondary teachers. Only a "teacher or instructor in any technical college, the institute of technology at Washburn university or community college" receive the procedural protection formerly available to them *and* all elementary and secondary teachers. K.S.A. 2017 Supp. 72-2252(a). And a board is now defined as "the governing body of any technical college or the institute of technology at Washburn university, and the board of trustees of any community college." K.S.A. 2017 Supp. 72-2252(b). The statute no longer includes the boards of education of public school districts. Thus, by the plain language of the 2014 amendments, teachers in school districts no longer benefit from the TDPA's procedural right of a notice listing the reasons for a board's decision or the right to request a hearing.

The Kansas National Education Association brought suit against the State challenging the 2014 amendments, arguing the Legislature had violated the single-subject rule of Article 2, § 16 of the Kansas Constitution. Although we determined the KNEA had standing, in part because it was alleged that KNEA members lost "valuable rights" under the 2014 amendments, we held the legislation did not violate the single-subject rule. *KNEA v. State*, 305 Kan. 739, 747, 760, 387 P.3d 795 (2017).

Scribner and McNemee brought this separate suit alleging individual harm. Their case depends on the stipulated facts and, according to them, when the Board did not renew Scribner's and McNemee's contracts by the third Friday in May 2015, they were both provided the notice required by the statute then in effect—the statute as amended effective July 1, 2014. See K.S.A. 2014 Supp. 72-5437. In other words, the Board fully complied with current TDPA provisions. Against that factual situation, we determine whether the 2014 amendments violated their constitutional rights.

ISSUE 1: *Did Scribner and McNemee have a property interest that is entitled to constitutional protection under either the federal or state constitution?*

Scribner and McNemee first challenge the constitutionality of the 2014 amendments. Scribner and McNemee separate their challenge into two theories: (1) The Legislature retroactively took away a vested right and (2) the Legislature violated the Fourteenth Amendment to the United States Constitution and Sections 1 and 2 of the Kansas Constitution Bill of Rights by depriving them of a property interest without due process. Both theories present an issue of law to which this court applies unlimited review. See *Miller v. Johnson*, 295 Kan. 636, 646-47, 289 P.3d 1098 (2012).

Scribner and McNemee note this court has previously stated that Sections 1 and 2 of the Kansas Constitution Bill of Rights have "much the same effect" as the Due Process and Equal Protection Clauses found in the Fifth and Fourteenth Amendments to the United States Constitution. Generally, this statement has been made in cases where a party asserts violations of both constitutions and relies on cases applying the United States Constitution without making unique arguments about Sections 1 and 2. E.g., *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005). But we have also held these provisions provide stronger rights than the Fourteenth Amendment. E.g., *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987). Because neither party makes arguments unique to Sections 1 and 2 nor argues any distinction between the rights granted by the two

12

constitutions, we will not delve in any potential differences. Instead, we will assume, without discussion, the Fourteenth Amendment and Sections 1 and 2 grant the same due process rights.

We combine our discussion of Scribner's and McNemee's vested rights and due process theories because "the vested rights analysis is inseparable from the ultimate due process inquiry." *Brennan v. Kansas Insurance Guaranty Ass'n,* 293 Kan. 446, 460, 264 P.3d 102 (2011); *Resolution Trust Corp. v. Fleischer*, 257 Kan. 360, 365, 892 P.2d 497 (1995). As we will discuss, even if Scribner and McNemee had a property right, they did not enjoy a vested right that could not be removed or altered through due process. To explain, we turn to Scribner's and McNemee's due process theory that the Legislature divested their property right without due process.

Our caselaw supports the first part of this theory. In past decisions, this court has held the TDPA created a property right. E.g., *McMillen v. U.S.D. No. 380*, 253 Kan. 259, 264, 855 P.2d 896 (1993) ("[A] tenured teacher's right to continued employment is a property right subject to the protections of due process."); *Kelly v. Kansas City, Kansas Community College*, 231 Kan. 751, Syl. ¶ 3, 760, 648 P.2d 225 (1982) ("A tenured teacher has an expectation of continued employment which qualified for constitutional protections as a species of property."). The State, as the Intervenor, argues this court incorrectly decided these cases.

We need not revisit the holdings in *McMillen* or *Kelly*, however. Even if Scribner and McNemee had a property interest, it does not necessarily follow that the right had vested in a way that the Legislature could not remove the right through due process. K.S.A. 2017 Supp. 72-2259, which has not been amended since enacted in 1974, makes this clear. It states, in relevant part: "Nothing in this act shall be construed to create any

13

right, or to authorize the creation of any right, *which is not subject to amendment or nullification by act of the legislature*." (Emphasis added.)

In addition, as the district court noted, the legislative process itself generally provides all the process that is due when legislation results in the complete or partial deprivation of protected property interests of more than a few individuals. The United States Supreme Court made this point in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982). There, the Court pointed to situations in which a state legislature passed legislation that impacted protected property interests, including laws that granted state officials immunity from some tort claims and laws that adjusted welfare benefit levels. The *Logan* Court concluded: "In each case, the legislative determination provides all the process that is due." 455 U.S. at 433.

*Logan* traced this concept back to *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 36 S. Ct. 141, 60 L. Ed. 372 (1915), in which the Court refused to enjoin enforcement of an order of the Colorado State Tax Commission and State Board of Equalization increasing the valuation of all taxable property in Denver. A Denver property owner argued he had not been given an opportunity to be heard and the order therefore violated due process. In rejecting that argument, the Court noted: "Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." *Bi-Metallic Investment Co*., 239 U.S. at 445. Instead, "the body intrusted by the state Constitution with the power" may pass legislation that affects "the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard." 239 U.S. at 445.

Other courts have consistently applied this rule to the reduction or elimination of protections for public employees. E.g., *Dibble v. Quinn*, 793 F.3d 803, 808-10 (7th Cir. 2015) (arbitrators' terms were legislatively shortened); *Rea v. Matteucci*, 121 F.3d 483,

14

484-85 (9th Cir. 1997) (hearing officer position legislatively changed from classified to unclassified position); *McMurtray v. Holladay*, 11 F.3d 499, 504-05 (5th Cir. 1993) (state employees temporarily exempted from due process procedures during departmental reorganization); *Gattis v. Gravett*, 806 F.2d 778, 781 (8th Cir. 1986) (state employees recategorized so they no longer received protections of personnel system); *Connecticut Educ. Ass'n, Inc. v. Tirozzi*, 210 Conn. 286, 297-300, 554 A.2d 1065 (1989) (change to teacher certification requirement imposing continuing education requirement); *Fumarolo v. Chicago Bd. of Educ.*, 142 Ill. 2d 54, 105-08, 566 N.E.2d 1283 (1990) (nature of principals' contracts legislatively changed from statutory right to continued employment to performance contract that terminated unless renewed).

The Seventh Circuit opinion in *Dibble* provides a recent and thorough discussion of the rule that the legislative process provides constitutional due process. *Dibble* considered challenges raised by two state-employed arbitrators. The arbitrators had been serving six-year terms under the protection of the Illinois Personnel Code, which meant they could only be removed for cause during their terms of service. The Legislature changed the appointment procedure. As part of this change, the Legislature ended the terms of all arbitrators three days after the bill passed and granted the governor discretion to reappoint the arbitrators. He reappointed one of the two plaintiff-arbitrators to a one-year term and did not reappoint the other. Both argued the legislation deprived them of a protected property interest, and the Seventh Circuit agreed. 793 F.3d at 808. That conclusion did not end the analysis, however. Likewise, we have assumed Scribner and McNemee had a protected property interest, but that conclusion does not end our analysis either.

The Seventh Circuit framed the next question as "whether the legislation deprived the [arbitrators] of their property interests without due process of law." 793 F.3d at 809. The court cited "the general rule that the legislature, having created a statutory

15

entitlement, is not precluded from altering or even eliminating the entitlement by later legislation." 793 F.3d at 809 (citing *Atkins v. Parker*, 472 U.S. 115, 105 S. Ct. 2520, 86 L. Ed. 2d 81 [1985]). "Were the rule otherwise, '[s]tatutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred.'" 793 F.3d at 809 (quoting *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104 [7th Cir. 1995]).

This general rule does not deprive individuals of all protection. "They have the opportunity to contest the legislative determination through the processes of representative government." 793 F.3d at 809 (citing *Bi-Metallic Investment Co.,* 239 U.S. at 445). Given that, the Seventh Circuit rejected the arbitrators' argument and concluded the arbitrators "failed to demonstrate a clearly established right that was violated by legislation ending their six-year terms as arbitrators." 793 F.3d at 814. Exceptions exist, however. These exceptions protect "'the individual citizen from state action that is wholly arbitrary or irrational.' . . . Similarly, an individual claiming a defect in the legislative process might have a claim for due process violations." *Rea,* 121 F.3d at 485 (quoting *Logan*, 455 U.S. at 433; citing *Atkins*, 472 U.S. at 130).

Scribner and McNemee cite *Rea* and argue the 2014 amendments are arbitrary and irrational and the legislative process was defective. In their reply brief they cite *Pool v. McKune*, 267 Kan. 797, 804-05, 987 P.2d 1073 (1999), which in turn cites *Turner v. Safley*, 482 U.S. 78, 89-90, 107 S. Ct. 2254, 96 L. Ed. 2d 65 (1987). Based on those cases, Scribner and McNemee suggest this definition: "An action is arbitrary or irrational when there is no rational connection between state action and the legitimate governmental interest put forward to justify it." Neither *Pool*, which dealt with reasonableness under the search and seizure provisions of the Fourth Amendment to the United States Constitution, nor *Turner* state this exact definition. Moreover, those cases provide no support for applying this test in the context presented by this case.

Even if the *Pool/Turner* test applies, Scribner and McNemee have failed to support their argument. They suggest we must find the legislation arbitrary because the senator who proposed the floor amendments did not justify the change. Nor did any other legislator do so during the process that followed the floor amendment. But they do not cite authority suggesting legislators must explain their actions on the record. And typically, when examining the rationality of government actions, courts examine whether there is any conceivable basis to support the action, even if that basis did not motivate the governmental body. See *Downtown Bar and Grill v. State*, 294 Kan. 188, 195, 273 P.3d 709 (2012). Here, however, Scribner and McNemee did not present this argument to the district court. In addition, by waiting until their reply brief before this court to raise the definitional argument, they left no opportunity for the Board or the State to adequately respond. Consequently, Scribner and McNemee have not preserved this question for our review. See *Sierra Club v. Mosier*, 305 Kan. 1090, 1134, 391 P.3d 667 (2017).

Scribner and McNemee make some additional assertions, which they argue establish that the Legislature acted arbitrarily. But these assertions go beyond the stipulated facts. And Scribner and McNemee took no steps, such as asking us to take judicial notice, to put those facts before us. See K.S.A. 60-412; K.S.A. 60-409; see also *Gannon v. State*, 305 Kan. 850, 870-73, 390 P.3d 461 (2017). As a result, we do not have the necessary factual basis to consider those assertions.

This leaves the question of whether the process itself was so defective that we must consider it arbitrary or irrational. In arguing it was, Scribner and McNemee rely on *Darling*, which involved a "unique set of facts" where the Kansas Legislature singled out "[a] handful of employees in a specific state agency" for termination. 245 Kan. at 48. The legislation also deprived the employees of their rights under the Kansas Civil Service Act. The changes in the law occurred as "a convenience to the agency's director," who

testified at "his deposition that termination through the civil service procedure was difficult and time consuming, and that the statute was beneficial as it gave him the flexibility he desired." 245 Kan. at 48.

The *Darling* court rejected the defendants' position that the Legislature had afforded due process, concluding the argument was "illogical in the framework of the facts herein." 245 Kan. at 49. The court emphasized that the legislation at issue did not apply generally but only to "known and identifiable individuals." 245 Kan. at 50. The court also noted that the agency's director actively discouraged the employees from lobbying against the bill by reminding them he would make the rehiring decisions and, when doing so, he would take into account whether an employee had actively opposed the bill. 245 Kan. at 50-51. On those unique facts, the *Darling* court concluded the legislation violated procedural due process. 245 Kan. at 52. Accord *Bi-Metallic Investment Co.*, 239 U.S. at 445-46 (distinguishing legislation that applies "to more than a few people" from legislation at issue in *Londoner v. Denver*, 210 U.S. 373, 385, 28 S. Ct. 708, 52 L. Ed. 1103 [1908], which involved a tax levy impacting "[a] relatively small number of persons . . . who were exceptionally affected, in each case upon individual grounds").

Unlike *Darling*, the 2014 amendments at issue here applied to *all* tenured teachers employed by *all* Kansas school districts. In addition, the Kansas Legislature did not terminate any teacher's employment and did not prohibit any school district from contracting with its teachers under the same terms as had been in the pre-2014 TDPA. Even so, Scribner and McNemee argue the holding of *Darling* still applies because of shortcomings with the legislative process employed in passing the 2014 amendments.

As previously set out, the history of the legislation reveals that no committee in either chamber of the Legislature held hearings at which members of the public could

18

testify about the amendments to the TDPA. Instead, the first mention of the amendments came on the Senate floor, where senators introduced them and passed the amended bill on the same day, a Thursday. On the following Sunday, a conference committee agreed, and the House passed the TDPA amendments.

Scribner and McNemee focus on the truncated consideration of the TDPA and the resulting lack of opportunity to testify or provide meaningful input before the amendments to the TDPA became law. In their view, these circumstances show a defect in the legislative process that denied them due process. They argue the legislative process gave them no notice or a hearing. But they do not cite any case in which a court has imposed these notice and hearing requirements when legislation that impacts a broad class of people caused the deprivation, which we assume the legislation has done here. Nor do they cite any laws or rules that prohibit the procedures used by the Legislature.

Contrary to Scribner's and McNemee's arguments, as we have discussed, a significant body of caselaw establishes that a hearing is not a due process requirement for the adoption of legislation: "[T]he Supreme Court long ago established that the federal Constitution does not require a hearing on the adoption of legislation." *Onyx Props. v. Bd. of Com'rs Elbert Cty.*, 838 F.3d 1039, 1044-45 (10th Cir. 2016) (citing *United States v. Locke*, 471 U.S. 84, 108, 105 S. Ct. 1785, 85 L. 2d. 2d 64 [1985]; *Logan*, 455 U.S. at 433; *Bi-Metallic Investment Co.*, 239 U.S. at 445-46). And public notice occurred when the Senate adopted the amendments and sent the amendments to the House for consideration.

The State cites cases that further bolster its argument that nothing more was required. For example, it highlights the United States Supreme Court's statements in *Minnesota Bd. for Community Colleges v. Knight*, 465 U.S. 271, 285, 104 S. Ct. 1058, 79 L. Ed. 2d 299 (1984). There, the Court held: "The Constitution does not grant to

19

members of the public generally a right to be heard by public bodies making decisions of policy." 465 U.S. at 283. The Court noted it had rejected a similar claim founded on the Due Process Clause of the Fourteenth Amendment in *Bi-Metallic*. The Court also commented:

> "Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted. Legislatures throughout the nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received from only a select group. Executive agencies likewise make policy decisions of widespread application without permitting unrestricted public testimony. Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices." 465 U.S. at 284.

We find these authorities persuasive and conclude that constitutional due process does not require the Legislature to conduct a hearing before repealing legislation that granted a right to procedural due process. We therefore reject Scribner's and McNemee's argument that the 2014 Legislature deprived them of due process by passing legislation without providing notice or a hearing.

Overall, although Scribner and McNemee criticize the legislative process and the lack of transparency, their criticisms, even if valid, do not equate to a constitutional violation. The legislation here impacted a broad class of people, not a targeted group of limited and identifiable individuals. The changes were comparable to a change in status from classified to declassified status, and as discussed, courts have often upheld those legislative changes when attacked on due process grounds. In addition, no one here dissuaded the affected people from lobbying, although as a practical matter, their window

in which to do so was small if not nonexistent. And the legislative process followed its regular course. Both chambers met to reconcile the differences, including the amendments to the TDPA. Each chamber independently had an opportunity to debate the bill before the chamber voted to pass the bill.

Passage of L. 2014, ch. 93, §§ 49, 50, 52, 53 did not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution or Sections 1 and 2 of the Kansas Constitution Bill of Rights.

ISSUE 2: *Did the Board violate the teachers' continuing contract right by failing to employ them for the 2015-16 school year and thereafter?*

Scribner and McNemee premise their breach of contract argument on their position that the 2014 amendments to the TDPA cannot be applied and therefore the pre-2014 version of the statute applied. They do not base their claim on their actual contracts with the Board.

The stipulated facts establish that the Board complied with the statutory requirements in effect in May 2015. Thus, Scribner's and McNemee's continuing contract claim also fails.

Affirmed.